## MORRIS *v.* REMINGTON.

When a bill is filed praying for an injunction against a defendant for a nuisance affecting the plaintiff's land in Montgomery county by the diversion of a water-course, which consisted of a natural stream running through the farms both of defendant and plaintiff, the Court of Common Pleas sitting as a Court of Equity in Philadelphia has no jurisdiction, although the use of the water was regulated by contract between the parties, and process issuing from said Court had been served upon the defendant in Philadelphia.

Proceedings in a Court of Chancery are, like proceedings in all other judicial tribunals, sometimes *local* and sometimes *transitory*.

Where imprisonment of the person is the most proper means to effect that which is decreed to be done, viz. the *payment of money*, making a conveyance, or the like, then the jurisdiction is local. But where no obedience of the person or any act of his can sufficiently execute such a decree, then the jurisdiction is *not local*.

So the jurisdiction of a Court of Chancery can be sustained in a case of *fraud, trust,* or *contract,* wherever the person be found, although land not within the jurisdiction of the Court may be affected by the decree. Where, however, it is a clear question of title, and the property is not within the jurisdiction of the Court, there its jurisdiction cannot be sustained.

To justify a Court of Chancery in exercising a jurisdiction in cases touching lands in foreign counties, the relief sought for must be of such a nature as the Court is capable of administering in the given case.

A Court of Equity has not necessarily jurisdiction over a subject even of ordinary equity cognisance simply because the parties are within the forum. Although it may be generally true, that in equity, jurisdiction over the person draws with it jurisdiction of the *causa litis,* yet there are exceptions to this rule well defined.

To give a complete remedy in case of a nuisance in a Court of Equity, it must include the restraint and prevention of a contemplated nuisance, the removal of such a nuisance when perpetrated, and compensation in damages for injuries resulting from such nuisances in such cases. Nor must restraint and removal fall short of doing entire justice to the party aggrieved.

A Court of Chancery can order private nuisances to be abated, as well as restrain them from being erected. Hence it has been ruled that if a party by erecting a dam raises a stream of water above the natural level, so as materially to injure mills above on the same stream, a Court of Chancery will decree that the dam be lowered, and that the party erecting it pay all the damages occasioned by raising the water above its natural level. The damages will generally be ascertained by an issue at law, through the verdict of a jury.

But for a Court of Equity to give this ample relief, the *locus in quo* must be within the absolute jurisdiction of that Court.

*Oct. 25.* THIS was a bill in equity, filed by the plaintiff, Israel

W. Morris, against Thomas P. Remington, setting forth that in the year 1747, John Hughes and John Evans were respectively seised of adjoining farms, then in Blockley and Lower Marion townships, Philadelphia county, but now in Montgomery county, except that a part of the farm which then belonged to Hughes was still in Philadelphia county; that there was a creek or stream of water which ran through said farms, flowing from the farm of Evans into that of Hughes, describing its course. That upon the farm of Hughes there was erected a dam, by which the waters of said creek were collected in a pool, and drawn off into a race or ditch, then on said farm, for the purpose of irrigating his land, and for other purposes. That on the 21st of March, 1747, said Evans and Hughes entered into an arrangement, for a sufficient consideration, which was stated in the bill, for which the said John Evans granted and conveyed to the said Hughes, his heirs and assigns for ever, the free and unmolested liberty of extending the water-course of him, the said Hughes, so far into the land of said Evans, that the whole stream of the creek might be conveniently brought into that part of a race that was cut in the land of said Hughes, without damming the water out of its channel, and the free and unmolested liberty of eight feet on each side of the water-course, to pass and repass, either to cut, cleanse, or repair the ditch, or water-course, at any times thereafter for ever. And by the same agreement the said John Evans agreed to keep bridges over said race in such places where he had occasion commonly to cross it. The whole agreement and deeds were attached to the bill.

It was also averred by the plaintiff, that, by divers good conveyances and assurances in the law, the title to said farm and water rights formerly belonging to said John Hughes, he was seised in fee of the same.

It was also stated in the bill that up to the first day of May, 1849, for a period of more than fifty years, the plaintiff was in the free, unmolested, uninterrupted, and undisturbed enjoyment of the rights and privileges which he had acquired, and which were conveyed by the said deeds, which were and are of great value and importance to him. And that, for upwards of fifty years, himself and tenants had drawn the water from said creek, at a point within the land, formerly of said John Evans, well defined, and as well known and distinguishable on the ground as it was prior to the first day of May, 1849, as the point of junction between the channel of the creek, and the extended race and water-course, but under and in pursuance of the authority of the agreement aforesaid.

The plaintiff also stated in his bill, that, during all the time of his occupancy of said premises, and long before, he and those under whom he claims had, in pursuance of the authority of said agreement, erected and maintained a dam or obstruction across the channel of said creek immediately below its junction with the extended race, so as to turn the whole stream of said creek into the ditch or race, but not of sufficient height to throw back the water of said creek out of its channel in such a way as to overflow the meadow above.

It was then charged in the bill, that a short time prior to said 1st day of May, 1849, Remington, the said defendant, purchased the farm, formerly belonging to said John Evans, expressly subject to the rights and privileges in respect to the said water, granted to said John Hughes, his heirs and assigns, and recognised by the grantor to said defendant. That on or about the said 1st day of May, 1849, the said Remington, under the pretence of draining his meadow, and improving its appearance by his workmen, opened a new channel or passage for certain springs or waters which had hitherto contributed to supply said creek or stream, by which proceeding said defendant had diverted said springs or waters entirely from said creek or stream, consequently from the plaintiff's race or ditch; and he was thereby deprived of an important addition to the water, which he was entitled to for the purpose of filling his race, and greatly to his injury.

The bill also stated that the water in time of freshets came down said race or channel so as to fill it; that by plaintiff, in conjunction with the owners, logs were placed by the complainant in the bank of said race at a particular point, and at the creek, so that it was always kept about the same height with the dam. That the defendant, not regarding the rights of property of the plaintiff under said deeds, had filled up the channel of said creek below the original point of junction, and made a new and artificial channel of said creek, and had also taken away the log by which the evidence of the water level was preserved, and at one point reduced the height of said race, so that the whole of the water flowing down said race at that point is intercepted, and diverted into the new channel cut by the defendant, so that no water whatever runs or flows in the plaintiff's race or ditch below that point which is on the defendant's farm, by means whereof the complainant is entirely deprived of the use of said water. And the plaintiff further averred in his bill that the said water has been always heretofore used by him for the purpose of irrigating his meadow,

and was and is of great value and importance to him. It was also stated in the bill that the plaintiff had remonstrated against the acts of the defendant in all these particulars, and against his diverting of the water from the race and ditch, as being unjust and illegal. The bill then contained numerous interrogatories for the defendant to answer, and also prayed for an injunction against the defendant from further filling up the old channel of said creek, or further proceeding in the alteration of the course and fall of the water in said stream; also that he be enjoined to replace the waste log, and raise the level of the waste back to its original height; at the point of intersection, so that the water might be placed in the race of the plaintiff in its accustomed manner. And that the defendant should be enjoined to restore the said creek or stream, and race or ditch, to their former relative position and condition, so that the water of said creek or stream may flow into the said ditch or race, in the same quantity and with the same force that it had been accustomed to do. And that the defendant be required to reconnect with said creek and race the said springs so diverted from the channel of said creek, above the original junction of said race and said stream. There was also a prayer for general relief.

Process was served upon the defendant in the county of Philadelphia. He appeared, and by his counsel pleaded that the whole of his land referred to in the bill of the complainant, and the stream of water thereon, and the subject of controversy in the cause, were wholly within the county of Montgomery, and not within the county of Philadelphia. And that the said complainant and defendant did at the time of the filing of the said bill reside in the county of Montgomery.

The cause was argued by *T. I. Wharton* for the plaintiff, and *St. Geo. T. Campbell* for the defendant.

Mr. *Wharton* contended the Court had jurisdiction not only of the parties, but of the subject-matter; and cited 6 W. & S. 552; Copel *v.* Jones, 2 Eden, 182–4; 1 Vesey, 44; 3 Vesey, 470; 2 Story's Eq. 443–4, 879, 1291; 6 Cranch, 128; 2 Paige, 404; 6 Simon, 504; 2 Eden, 100; 2 Jacob & Walker, 515; 5 Madd. Rep. 298; 6 Wharton, 397; 2 Barr, 160; 3 Mylne & Keen, 104; 2 Story, 743, 744, 897.

Mr. *Campbell* contended that suits in Chancery, like actions at law, are sometimes local and sometimes transitory. They may be

to be local whenever from the cause of complaint it becomes neces-
sary for the decree to act upon the thing, as in cases of partition, or
dower; but transitory when the decree may be enforced *in personam:*
cited 4 Monroe, 436; Austin *v.* Bradley, 1 J. J. Marshall, 256;
5 Madd. 307, 89; 3 Gill & John. 505.

The opinion of the Court was delivered by

KING, President.—The question raised on this record is, whether
this Court sitting in equity has jurisdiction in a bill filed by the
plaintiff, complaining against the defendant for setting up and
maintaining, in Montgomery county, a nuisance affecting the
plaintiff's land in that county. The nuisance complained of con-
sists in the diversion of a natural stream, flowing through the lands
of the defendant and the plaintiff, and which the latter claims the
right to make use of for the purposes of irrigation, in virtue of
certain agreements entered into between the former owners of the
contiguous farms, now owned and occupied by the litigant parties.
Territorial jurisdiction over the *locus in quo*, we have none; the
supposed bases of our jurisdiction resting on the fact that process
has been served on the defendant in this county; and that, as
equity always acts *in personam* the locality of the tort complained
of is immaterial. Broad as is the language of the text-writers, and
even of the Courts, in regard to this position that equity, having
possession of the person of the wrong-doer, acts without regard to
the local origin of the tort, it is nevertheless true that proceedings
in chancery are like proceedings in all other judicial tribunals;
sometimes local and sometimes transitory: dower and partition,
for instance, are among the admitted jurisdictions of the former
kind. The case of Cartwright *v.* Petrus, 2 Chan. Ca. 214, 1 Eq.
Ca. Abr. 133, decided as early as 27th Charles 2, shows this.
There one of two joint tenants of lands which lay in Ireland filed
his bill in the English Equity for an account of the profits, *and for
a partition of the land.* The bill was entertained as to the profits,
which were personalty, but not as to the partition, which was in
the realty; for, says the Court, *a commission to make partition
cannot be awarded into Ireland.* The best report of this case is
found in a note to Kennedy *v.* The Earl of Casselles, 2 Swanst. 342,
and which is extracted from Lord Nottingham's manuscripts. In
commenting on the cases in which jurisdiction is entertained in
equity over extraterrial torts, this great Judge says, that "all this
is to be understood of such cases where imprisonment of the per-
son is the most proper means to effect that which is decreed to be

done, viz. *the payment of money, making a conveyance, and the like.* But where no obedience of the person, or any act of his, can sufficiently execute such a decree, there it is in vain to hold such a plea, and thus in this case; for to a partition in chancery it is necessary to award a commission to some neighbouring justices to divide the land; if they refuse, there lies attachment against them for such refusal; if they execute the commission and return it, then there ought to be a decree that the lands be accordingly conveyed, and that till a conveyance they may be so enjoyed; the consequence thereof is a sequestration, and an injunction for the possession, *and a writ of assistance to the sheriff, none of all which can be awarded into Ireland, nor be* supplied by the obedience of the person imprisoned here." Robordeau *v.* Rous, 1 Atkyns, 543, was a bill brought for the delivery of the possession of a moiety of lands in St. Christopher's, and likewise for an account of rents and profits. The defendant demurred to the first part of the bill, "for that this Court had no jurisdiction of lands in St. Christopher's." "As to the first part of the demurrer," said Lord Hardwicke, "I apprehend it is very right, because this Court has no jurisdiction *so as to put persons into possession, in a place where they* have their own modes on such occasions, *to which the* party may have recourse; the present bill, therefore, is carrying the jurisdiction further than it ever was before." He then refers to a case of Angus *v.* Angus, decided in 1736, 1 West's Rep. 533, Story's Equity, § 1296, where he had assorted the jurisdiction so far as respects fraud and discovery, although the lands lay in Scotland.

The question of the extent and limitation of equity jurisdiction, has also met the attention of American jurists; and we have, among others, the views of perhaps the greatest of American Judges, I mean the late Chief Justice Marshall, as expressed in the case of Massie *v.* Watts, 6 Cranch, 148. That was a bill filed in Kentucky by a citizen of Virginia against a citizen of Kentucky, to compel the conveyance of lands in Ohio, to the former, of which the latter had obtained the legal title, with knowledge of the plaintiff's equitable title. The Chief Justice, in delivering the opinion of the Court, after reviewing some of the more prominent English authorities on this point, sums up the result thus. "The jurisdiction of a Court of Chancery is sustainable in a case of *fraud, trust,* or *contract,* wherever the person be found, although lands not within the jurisdiction of the Court may be affected by the decree. The inquiry therefore will be *whether this be an unmixed question of title,* or a case of *fraud, trust,* or *contract.*"

A glance at the English decisions will show that they all range themselves under one or other of these categories. The case most frequently .cited in this connexion, is that of Penn v. Lord Baltimore, 1 Vesey, Sr. 444, which was a bill brought to compel the *specific execution* of a *contract*, respecting the boundary lines between Pennsylvania and Maryland. The case of the Earl of Athol v. The Earl of Derby, 1 Chan. Ca. 221, was instituted to compel the *performance* of a *contract* respecting the Isle of Man, which was enforced by the English Chancery, although the Isle was without the realm. The case of Archer v. Preston, cited by Lord Nottingham in Arglasse v. Muschamp, 1 Vern. 77, arose on a *contract* for land in Ireland. These cases all range under the first category, viz. cases arising under the head of specific performance of contracts between the parties to the record : Arglasse v. Muschamp, 1 Vern. 77, was a case springing out of the grant of a rent charge on lands in Ireland, fraudulently obtained in England. Lord Nottingham treated the denial of his jurisdiction with great indignation, and subjected the defendant to costs for attempting to oust the Court of its jurisdiction ; and this, simply because the plaintiff came into Court to be relieved against a fraud, practised upon him, within its admitted jurisdiction. Under this head may be classed Cranstown. v. Johnson, 3 Vesey, Jr. 182 ; Jackson v. Petrie, 10 Vesey, 164 ; White v. Hall, 12 Vesey, 323, and some others.

The case of the Earl of Kildare v. Sir Maurice Eustace and Fitzgerald, arose on a *trust* of lands in Ireland, the trustees living in England. All the English cases, including as well those in which the jurisdiction has been exercised as those in which it has been repudiated, fully justify Chief Justice Marshall in saying, " That it is where the defendant in the original action is liable to the plaintiff either in consequence of *contract*, or as trustee, or as the holder of a legal title acquired by any species of *males fides* practised on the plaintiff, that the principles of equity give a court jurisdiction wherever the person may be found ; and the circumstance that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest the jurisdiction :" Massie v. Watts, 6 Cranch, 158. In a cause, however, involving a naked question of title, he admits the jurisdiction could not be sustained.

Commenting on this important doctrine, Judge Story, a lawyer whose fault was certainly not timidity in asserting equity or civil law jurisdiction, observes, that " it must be borne in mind that the doctrine is not without limitation and qualifications ; and that to

50

justify the exercise of jurisdiction in cases touching lands in foreign countries, *the relief sought for must be of such a nature as the Court is capable of administering in the given case."* He adds, after citing Cartwright *v.* Petrus, to the reasoning of Lord Nottingham, this remark: "Perhaps a more general reason might be given, founded upon the principles of international law; and that real estate cannot be transferred, or partitioned, or charged, except according to the laws of the country where it is situated." It may be here aptly remarked that in reference to local actions respecting lands in Montgomery county, this Court has no more jurisdiction than if they were in the county of Middlesex, in England.

The authorities quoted seem to us very clearly to demonstrate the proposition that a Court of Equity has not necessarily jurisdiction over a subject, even of ordinary equity cognisance, simply because the parties are within the forum; but that though it may be generally true that in equity, jurisdiction over the person draws with it jurisdiction of the *causa litis*, yet has this rule exceptions as well defined as the rule itself.

What then is the nature of the case before the Court? and is it contained within the general rules, or embraced within the exceptions? For this is the single and simple question for solution.

At the old common law, and before chancery had made its modern strides towards general civil jurisdiction, the remedy for a party suffering under the wrongs complained of in this bill, would have been an assize of nuisance: Viner's Abr. tit. *Nuisance*, (E), vol. 16; Ibid. (G), (H), pl. 20, 27, et seq. The modern remedy for such a tort is an action on the case: 4 Dall. Anon. 47; Dyer, 248, B.; Archbold N. P. vol. 1, p. 421, tit. *Nuisance*. But both assize and action on the case are *local actions*, and must be brought in the county where the land lies: Warren *v.* Webb, 1 Taunt. 379; Mersey Nav. Comp. *v.* Douglass, 2 East, 497; Beerly *v.* Shaw, 6 East, 208; 16 Viner's Abr. tit. *Nuisance*, (X), pl. 14.

The superior promptness of, and vigour in the action of equity, has given rise to the modern procedure in that Court by bill. The jurisdiction, in cases like the present, is fully established by a series of decisions, both in England and in this country: Robertson *v.* Lord Byron, 1 Bro. C. Rep. 588; Lane *v.* Newdington, 10 Vesey, 193; Gardner *v.* The Village of Newbery, 2 Johnson's Chancery Cases, 272; Belknap *v.* Belknap, Ib. 463; Hammond *v.* Fuller, 1 Paige, 197; Arthur *v.* Case, Ib. 497. The manner in which this jurisdiction is exercised in equity is material to be considered in

examining whether this jurisdiction is local or transitory; for, if things are required to be done in order to effect complete justice in such a case, which a local Court of Equity has no power to execute, then, according to Lord Nottingham's and Lord Hardwicke's standards of jurisdiction, the given case is not embraced by the legitimate jurisdiction of the Court.

The remedies in equity, in cases of private nuisances, to be co-extensive with the wrong, must have a triple aspect. They must include the restraint and prevention of a contemplated nuisance; the removal of such a nuisance when perpetrated before the action of the Court has been invoked; and compensation in damages for injuries resulting from such nuisances, in cases where restraint and removal falls short of doing entire justice to the party aggrieved. And to this extent fully, has the action of Courts of Equity gone, in cases of private nuisances. To stop short of this, would be an admission of a want of power in the Court to give a perfect remedy to its suitor. Thus Robinson *v.* Lord Byron was a case in which the defendant on the filing of the bill, and before answer, was enjoined against using dams, wears, and other erections, in any other way than they had been used before the time when the aggression complained of commenced. Lane *v.* Newdington was also the case of an injunction awarded before answer, in which, although Lord Eldon doubted of his right to order restoration before hearing, of part of the works destroyed by the defendant, yet he so framed the injunction as to create the necessity of such restoration, in order to a perfect compliance therewith. In the more modern case of Rankin *v.* Hankinson, 4 Simons, 13, the Vice-Chancellor, Sir Launcelot Shadwell, adopted the same course in an analogous case; and the same Judge, in Spencer *v.* The London and Birmingham Railway Company, 8 Simons, 193, reasserted the same principle. So much for the preventive jurisdiction.

In Van Bergen *v.* Van Bergen, 2 John. C. Rep. 272, Chancellor Kent held that chancery can order private nuisances to be abated, as well as restrain them from being erected. East India Company *v.* Vincent, 2 Atkyns, 83, is a case in which Lord Hardwick actually made such an order; and in Ryder *v.* Bentham, 1 Vesey, Sr. 544, the same great Chancellor reasserted this authority in the Court which he had previously exercised in East India Company *v.* Vincent.

Finally, in Hammond *v.* Fuller, 1 Paige, 197, it is ruled that if a party by erecting a dam raises a stream of water above its natu-

ral level, so as to materially injure mills above on the same stream, a Court of Chancery will decree that the dam be lowered, and that the party erecting it pay all the damages occasioned by raising the water above its natural level. The mode resorted to by the Court, to inform itself as to the amount of the complainant's damages, was the awarding an issue at law for their ascertainment through the verdict of a jury.

These authorities then demonstrate, that the relief that might be demanded of us by the plaintiff, assuming that he could sustain his bill on the merits, is a perpetual injunction against any further disturbance of the stream; a decree to restore the water-course to its condition as it existed before the injury complained of; and, if necessary, the prostration of any works which interfere with that result; and, if requisite to entire justice, the awarding of an issue at law, for the ascertainment of any damages he may have sustained by the unlawful acts complained of.

In none of the cases cited, and in none that can be found in the reports of equity decisions, has relief analogous to this been extended, where the *locus in quo* did not lie within the absolute jurisdiction of the Court. In cases arising in England proper, such a question could indeed be rarely agitated, because the jurisdiction of the English Chancery is co-extensive with that kingdom. But though we find cases of fraud, trust, and contract originating, and connected with land situate in Scotland, Ireland, and the colonies, yet nowhere do we see it even hinted that equity could or would exercise, elsewhere than in England proper, the peculiar jurisdiction of chancery in trespass or nuisance. If the plaintiff's argument is sound, English equity is competent to adjudge on the proper use or abuse of land in the four quarters of the globe, provided the parties interested in it happen to find themselves within the jurisdiction of the English Chancellor; and this without regard to the fact whether the lands are within the British dominions or otherwise. Extravagant as may seem this proposition, it follows from the assimilation of the jurisdiction of equity, in questions of fraud and discovery respecting lands, with questions of trespass or nuisance perpetrated thereon. For we have the authority of Lord Hardwicke for saying that on questions of fraud and discovery, "If the land lay in *France*, and the persons resident there, the Court has jurisdiction, because as respects *fraud*, the jurisdiction is over the conscience of the party:" Angus *v.* Angus, 1 West. Rep. 23, cited in Story's Equity Juris. § 1296. This certainly is carrying

the principle of " *ampliare jurisdictionem*" quite far enough. And this seems to have been the sentiment of Judge Story when in his Conflict of Laws, § 544, he declares that the doctrines of the English chancery under this head are carried to an extent which may in some cases not find a warrant in the general principles of international public law.

In Cartwright *v.* Petrus, Lord Nottingham has furnished us the reason why, as to such a case as the present, chancery will not exercise extra-territorial jurisdiction. It is because it lacks the powers to carry its decrees into full effect. If the Court has the authority to decree the abatement of a nuisance, it has the power to carry its decree into execution; for a Court that orders that to be done which it cannot enforce, is in danger of finding its dignity sadly compromised. By the writ of assistance, or some process analogous to it, the Court must carry into actual execution its decree for the abatement of nuisance: 1 Smith's Practice, 448; 1 Daniell, 723–4; Hopkins, 442; 8 Paige, 33; 2 Anstruth. 603. Now in Cartwright *v.* Petrus, 2 Swanston, 324–5, Lord Nottingham distinctly says that neither "a sequestration and injunction for possession, nor a writ of assistance, can be issued into Ireland;" and hence denied his jurisdiction in partition of lands lying there, because of his want of means to carry a decree for that purpose into effect. If such embarrassments are found in the way of an English Chancellor, exercising his great and plenary jurisdiction, what is the position of a County Court of Common Pleas, under like circumstances ? Can we send a writ of assistance into another county, directing the sheriff of that county to prostrate this alleged nuisance, if entertaining the bill, we should on the merits adjudge it to be such? Can we award an issue into the county where the nuisance exists, in order to inform ourselves what are the damages the defendant has sustained by its perpetration and continuance; for, in the proper county where the jury could have a view, can such an issue only be properly tried? The difficulties which would beset us at every step, must make us pause and ponder before we enter such a path, even was it freely open to us. But this is shown not to be the case, if we have succeeded in establishing that, the present is not one of the cases over which chancery assumes jurisdiction simply from finding the alleged wrong-doer within its jurisdiction. It is not a case arising from fraud or trust, nor does it arise from contract within the sense that term is employed by Courts of Equity in defining their jurisdiction over such subjects. The contracts

which give equity jurisdiction are express contracts, *inter partes;* not moral and legal obligations, such as those which bind one man to leave another in the undisturbed enjoyment of easements of land in a foreign jurisdiction, charged on the land of the former, in the same country, particularly where such easements have not been erected by the defendant, but are charges on his land, created by former proprietors. Interference with such easements by such an owner of the servient estate is a tort, and it is on that footing that this bill seeks for the relief that equity gives against this class of tort-feasors. But although the complainant exhibits a case for relief, he exhibits it to an incompetent forum. It is to the Courts of Montgomery county that he must apply, at law or in equity, according as their jurisdiction will embrace his case, and give him the relief he desires. At law this jurisdiction would clearly be local, and so is the remedy which equity affords concurrently with law.

> In the judgment of the Court, the demurrer for want of juris-
> diction must be sustained, and the bill dismissed.